**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES GLAVAN, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>REVOLUTION LIGHTING TECHNOLOGIES, INC., ROBERT V. LAPENTA, CHARLES J. SCHAFER, and JAMES A. DEPALMA,<br><br>          Defendants. | No. 1:19-cv-00980-JPO<br><br><br>**REPLY IN FURTHER SUPPORT OF FRED REMER'S MOTION FOR (1) CONSOLIDATION; (2) APPOINTMENT AS LEAD PLAINTIFF; AND (3) APPROVAL OF LEAD COUNSEL** |
| CHRIS HUBNER, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>REVOLUTION LIGHTING TECHNOLOGIES, INC., ROBERT V. LAPENTA, CHARLES J. SCHAFER, and JAMES A. DEPALMA,<br><br>          Defendants. | No. 1:19-cv-02308-JPO |

*(captions continue on next page)*

BOB BISHOP, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

REVOLUTION LIGHTING TECHNOLOGIES, INC., ROBERT V. LAPENTA, CHARLES J. SCHAFER, and JAMES A. DEPALMA,

Defendants.

No. 1:19-cv-02722-JPO

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 3

I.      REMER POSSESSES THE LARGEST FINANCIAL INTEREST OF ANY
QUALIFIED MOVANT AND IS THEREFORE ENTITLED TO BE APPOINTED
LEAD PLAINTIFF ...................................................................................................... 3

      A.      Remer Suffered The Largest LIFO Losses .............................................. 3

      B.      Remer Suffered The Largest LIFO Losses Even If Constrained By The
Supreme Court's Decision In The *Dura Pharmaceuticals* Case ............................ 5

      C.      The Net Share Method Is Inappropriate For Determining Each Movant's
Financial Interest Where Five Partial Corrective Disclosures Have Been
Alleged ...................................................................................................... 8

CONCLUSION ........................................................................................................................ 10

Movant Fred Remer ("Remer")[1] respectfully submits this reply memorandum pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(B), in further support of his motion seeking consolidation of the above-captioned actions (the "Actions"), appointment as Lead Plaintiff for the consolidated Actions, and approval of Faruqi & Faruqi, LLP (the "Faruqi Firm") as Lead Counsel.  ECF Nos. 22-25; 34.

**PRELIMINARY STATEMENT**

On April 1, 2019, six motions for consolidation, appointment as Lead Plaintiff, and approval of Lead Counsel were filed by the following putative Class Members: (1) Remer; (2) Patrick and Wendy Graham (the "Grahams"); (3) Xinying Gong; (4) Police and Fire Retirement System of the City of Detroit; (5) Craig Holman and Russell Hopewell; and (6) Chris Hubner.

Of these movants, only Remer and the Grahams continue to seek appointment as Lead Plaintiff.  *See* ECF Nos. 30-34.  While Remer asserted out-of-pocket ("OOP")[2] losses of $1,308,632.02 in his opening papers, the Grahams argue that Remer's losses are at most $817,948.68.  *See* Memorandum of Law of Patrick and Wendy Graham in Opposition To Competing Lead Plaintiff Motions ("Graham Opp."), ECF No. 32, at 1.

---

[1]    Unless stated otherwise, the following conventions are used herein: (1) all ECF references are to *Glavan v. Revolution Lighting Technologies, Inc., et al.*, No. 1:19-cv-00980-JPO (S.D.N.Y.); (2) all defined terms shall have the same meaning as they did in Remer's opening brief, *see* ECF No. 23 ("Opening Br."); (3) all ECF pin cites are to the document's native pagination, but if no native pagination is available, ECF pin cites then refer to the ECF-generated pagination; (4) all internal citations and quotations are omitted; and (5) all emphases are added to quotations.

[2]    Out-of-pocket losses are "the difference between the value of what the plaintiff gave up [*i.e.*, paid] and the value of what the plaintiff received."  *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1020 (9th Cir. 1999).  "Securities fraud damages are 'ordinarily . . . based on out-of-pocket losses.'"  *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 235 (E.D.N.Y. 2014).

1

In response, Remer retained financial expert Zachary Nye, Ph.D. ("Nye") of Stanford

Consulting Group, Inc. to independently conduct two loss calculations concerning Remer's

trading of Revolution Lighting's stock during the Class Period: (1) Remer's OOP LIFO losses;

and (2) Remer's OOP LIFO losses which exclude Remer's so-called "in-and-out"[3] trades

pursuant to *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005). As confirmed by Nye,

Remer has significantly larger losses than the Grahams under both calculations.

Remer's initial OOP LIFO calculation of $1,308,632.02 included losses on all of Remer's

common stock sales during the Class Period, including his losses on 11,940 shares Remer

purchased prior to the Class Period. *See* ECF No. 24-3 at 2. In his calculations, Nye excluded

Remer's sale of these 11,940 shares—because the corresponding purchases were not Class

Period purchases and therefore not eligible for recovery—arriving at an OOP LIFO loss

calculation of $1,147,521. *See* Declaration of Zachary Nye, Ph.D. ("Nye Decl.") at ¶5 and Ex. 2

to the Nye Decl., both of which are filed contemporaneously herewith. Nye's reduced loss

calculation for Remer of $1,147,521 is still ***$317,092.18*** larger (*i.e.*, 38.2% larger) than the

Grahams' $830,428.82 in OOP LIFO losses. *See* ECF No. 12-3; Nye Decl. at ¶5.

Furthermore, even if all of Remer's in-and-out trades are excluded from Remer's loss

calculation, Remer suffered $1,245,936 in losses, an amount that is $414,507.18 larger (*i.e.*, 50%

larger) than the Grahams' $830,428.82 in losses. *See* Nye Decl. at 6; Ex. 3. Regardless, the

Grahams' *Dura* argument is premature at this stage of the proceedings.

Additionally, the net shares methodology that the Grahams belatedly proffer as the

relevant test for each movant's financial interest is inappropriate given the multiple partial

---

[3]    "In-and-out" traders are those who both purchase and sell their shares prior to
a corrective disclosure revealing the truth concerning a misrepresentation. *See Sklar v. Amarin
Corp. PLC*, No. 13-cv-06663 (FLW)(TJB), 2014 WL 3748248, at *9 n.8 (D.N.J. July 29, 2014).

corrective disclosures alleged in the Actions.  Indeed, the method has been soundly rejected by the weight of authority nationwide in favor of the OOP LIFO loss methodology.

Because Remer possesses the largest financial losses in the litigation and he has made a *prima facie* showing that he otherwise satisfies the adequacy and typicality requirements of Fed. R. Civ. P. 23, Remer is entitled to invoke the PSLRA's most adequate plaintiff presumption.  As no attempt has been made to rebut Remer's adequacy and typicality, Remer should therefore be appointed Lead Plaintiff, and his selection of the Faruqi Firm as Lead Counsel should be approved.

## ARGUMENT

**I.    REMER POSSESSES THE LARGEST FINANCIAL INTEREST OF ANY QUALIFIED MOVANT AND IS THEREFORE ENTITLED TO BE APPOINTED LEAD PLAINTIFF**

The Grahams attempt to dispute Remer's asserted financial interest by arguing that (1) Remer's OOP LIFO losses were incorrectly calculated; (2) Remer's in-and-out trades should be disregarded; and (3) the net shares method should be used to determine each movant's respective financial interests in the case.  Each of these arguments is fatally flawed.

### A.    Remer Suffered The Largest LIFO Losses

As evidenced by Nye's declaration, Remer's OOP LIFO losses are $1,147,521 (*see* Nye Decl. at ¶5), which is ***$317,092.18 higher*** than the Grahams' losses.  Although the Grahams posit that Remer's losses are only $817,948.68, Graham Opp. at 2, the Grahams' calculation suffers from two errors.  First, the Grahams misstate how the LIFO matching methodology works when calculating each movant's approximate losses, arguing that "LIFO means shares purchased last during a class period are matched to shares that are sold first."  Graham Opp. at 2. Not so.  A correct LIFO calculation "matches the sale of a share of stock to the price paid for the ***newest share*** in inventory", *i.e.*, the ***newest share*** currently held by the investor.  *In re Cigna*

3

*Sec. Litig.*, 459 F. Supp. 2d 338, 343 n.6 (E.D. Pa. 2006); *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011) ("LIFO calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale."); Nye Decl. at ¶3 n.2 ("Under the LIFO share matching methodology, sales are matched to the most recent purchase prior to that sale.").[4]

Second, the Grahams improperly reduced Remer's losses by the manner in which they accounted for the 11,940 shares that Remer purchased before the Class Period but sold during the Class Period. That is, the Grahams included the proceeds for sales of these stock purchases but excluded the amounts Remer paid (*i.e.*, the cost basis) to purchase these shares. *See* Nye Decl. at ¶6. As evidenced by Remer's loss calculation, Remer purchased 11,940 shares prior to the Class Period start of March 14, 2014 for $497,737.11. *See* ECF No. 24-3 at 2 (showing the first block of pre-Class Period purchases from July 7, 2013 through March 11, 2014 in light orange). Remer then sold all of these shares during the Class Period for $336,626.14 at a loss of $161,110.97. *See id.* (showing the first block of corresponding Class Period sales in light orange sold at a loss of $161,110.97). When the Grahams calculated Remer's losses, they excluded the $497,737.11 paid for those pre-Class Period purchases from the calculation. *See* ECF No. 32-1 at 2 (showing purchases beginning on January 22, 2015 and acknowledging an opening balance of 11,940 shares but nowhere noting the cost basis of those shares); Nye Decl. at ¶6. Notwithstanding, the Grahams included the $336,626.14 in proceeds that Remer collected from

---

[4]     The Grahams incorrectly assert that "LIFO means shares purchased last during a class period are matched to shares that are sold first." Graham Opp. at 2. In so doing, the Grahams mischaracterize the *Bo Young Cha v. Kinross Gold Corp.* court's statement that "under LIFO, stocks acquired most recently are assumed to have been the first sold[,]" No. 12 Civ. 1203(PAE), 2012 WL 2025850, at *3 (S.D.N.Y. May 31, 2012).

sales of those pre-Class Period purchases.[5]  *See* ECF No. 32-1 at 7; Nye Decl. at ¶6.  By including these sales and not the purchases, the Grahams effectively treated the 11,940 shares as if they were purchased at zero cost, thereby converting Remer's ***loss of $161,110.97*** into ***a gain of $336,626.14***—the difference between each side's initial calculations of Remer's losses.  This makes no economic sense, particularly when OOP losses are by definition a function of the amount that the plaintiff paid for the securities.  *See Ambassador Hotel,* 189 F.3d at 1020; *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 277 (S.D.N.Y. 2015) ("The adoption of a standard in which purchase price never plays a part in determining loss would work a radical change in the law."); *Gutman v. F.X. Sillerman*, No. 15 CIV. 7192 (CM), 2015 WL 13791788, at *6 (S.D.N.Y. Dec. 8, 2015) (rejecting movant's loss calculation when it did not use the purchase price as the cost basis of the shares); *Foley*, 272 F.R.D. at 129 ("Since sales matched with pre-class period purchases are not included in the calculation of class period losses, any gains or losses from those most recent sales would not be included in the total loss.").

**B.      Remer Suffered The Largest LIFO Losses Even If Constrained By The Supreme Court's Decision In The *Dura Pharmaceuticals* Case**

The Grahams assert that it was Remer's burden to exclude losses from his in-and-out trading because such losses are inconsistent with *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005), which requires that "a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  Graham Opp. at 2 & n.4.  The Grahams cite no authority for this proposition, and tellingly the Grahams fail to identify which of Remer's trades are at issue and the amount by which Remer's losses are supposedly overstated.

---

[5]      By contrast, Nye excluded ***both*** the cost basis ***and*** the proceeds from Remer's 11,490 shares, and arrived at a loss calculation of $1,147,521.  *See* Nye Decl. at ¶¶5-6.

5

According to Nye, even after excluding Remer's in-and-out transactions,[6] Remer's Dura-eligible losses total $1,254,936 (*i.e.*, approximately $400,000 more than the Grahams' $830,428.82 in losses) based on the shares Remer purchased during the Class Period that were held through at least one of the five alleged partial corrective disclosures.  *See* Nye Decl. ¶7 (citing Nye Decl., Ex. 3); ECF No. 12-3 at 4.  Thus, Remer possesses the largest financial interest even after in-and-out transactions are excluded.  *See Peters v. Jinkosolar Holding Co., Ltd.*, No. 11 Civ. 7133(JPO), 2012 WL 946875, at *5 (S.D.N.Y. Mar. 19, 2012) (Oetken, J.) ("It is well settled that '[f]inancial loss, the last factor, is the most important element of the test.'").

Regardless, it is premature to conduct a *Dura* analysis at the lead plaintiff stage given the length of the Class Period and five partial corrective disclosures already alleged.  *Dura* merely held that **at the pleading stage** an allegation that "the price on the date of the purchase was inflated because of the misrepresentation" was insufficient to meet the loss causation element of a claim under § 10(b) of the Exchange Act.  544 U.S. 336 at 342-43.  The Supreme Court reasoned that a "tangle of factors" affect the market price of security; thus "the most logic alone permits . . . is that the higher purchase price will sometimes play a role in bringing about a future loss."  *Id.* at 343.  The Supreme Court "did not suggest that a court should guess about the effect of [] as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue."  Gonnello Decl., Ex. A, *In re Watchguard Secs. Litig.*, No. C05-678JLR, 2005 U.S. Dist. LEXIS 40923, at *15 n.6 (W.D. Wash. July 13, 2005).  Consequently, courts are understandably wary of

---

6       Remer's losses when excluding in-and-out transactions are higher than when he does not exclude the transactions because **both gains and losses are excluded** when excluding in-and-out transactions.  *See Kinross*, 2012 WL 2025850, at *13 (When "exclude[ing] 'in-and-out' transactions . . . [a]ny gain or loss due to such transactions . . . should be excluded from the PSLRA loss calculus."); *Pelletier v. Endo International PLC*, 316 F. Supp. 3d 846, 849, 853 (E.D. Pa. 2018) (agreeing with movant's loss formula, which "exclude[ed] all [in-and-out] gains and losses" on shares "bought and sold before the first disclosure").

excluding in-and-out transactions at the lead plaintiff stage as "the appropriateness of employing *Dura* analysis at the lead plaintiff stage is subject to considerable dispute." *Cook v. Allergan PLC*, No. 18 Civ. 12089 (CM), 2019 WL 1510894, at *3 (S.D.N.Y. Mar. 21, 2019); *see also In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 117 (E.D.N.Y. 2012) (rejecting "contention that other movants improperly included regular trading losses from earlier stock sales that are not recoverable under the federal securities laws").

Where there are multiple partial corrective disclosures alleged—as is the case here— "ostensible 'in and out' transactions are compensable, even under *Dura*." *Allergan*, 2019 WL 1510894, at *3; *see In re Gentiva*, 281 F.R.D. at 115-16 (rejecting assertion that trading losses should be excluded where there were "several" partial disclosures). This is because multiple partial corrective disclosures "suggest that the fraud premium"—"the amount by which the stock is inflated because of the alleged misrepresentations or omissions"—"may have varied throughout the Class Period." *Id.* at *3, n.3. Here, the Actions allege that the Company's stock price dropped on the following days as a result of multiple partial corrective disclosures as the truth was revealed: (1) September 22, 2017, *Bishop v. Revolution Lighting Technologies, Inc., et al.*, No. 1:19-cv-02722-JPO (S.D.N.Y.), Class Action Complaint For Violations Of The Federal Securities Laws, ECF No. 1 ("Bishop Compl.") at ¶¶44-45; (2) August 2, 2018, *id.* at ¶¶48-49; (3) October 17, 2018, *id.* at ¶¶53-54; (4) October 22, 2018, *id.* at ¶¶55-56; and (5) November 15, 2018, *id.* at ¶¶58-60.[7] Given these multiple corrective disclosures, it would be incorrect to exclude Remer's in-and-out trades at this time.

---

[7]   By contrast, the Grahams' authorities are inapposite as they either involved only one corrective disclosure, *Khunt v. Alibaba Group Holding Ltd.*, 102 F. Supp. 3d 523, 528, 531 (S.D.N.Y. 2015) (excluding losses on in-and-out sales in action alleging only corrective disclosure); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2007 WL

**C.      The Net Shares Method Is Inappropriate For Determining Each Movant's Financial Interest Where Five Partial Corrective Disclosures Have Been Alleged**

Using the net shares method to compare the financial interests of Remer and the Grahams is inappropriate in this case.  "As many district courts have observed, net shares purchased and a retained shares calculation are less useful analytical tools where gradual disclosures are involved, because those methods assume a constant fraud premium throughout the class period." *Nicolow v. Hewlett Packard Co.*, No. 12-05980 CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013); *see also In re CMED Sec. Litig.*, No. 11 CIV. 9297 KBF, 2012 WL 1118302, at *4 n.8 (S.D.N.Y. Apr. 2, 2012) ("The Court is not aware of any case in this Circuit . . . that has calculated losses [under the retained shares methodology] for purposes of appointing a lead plaintiff where the pleadings allege partial corrective disclosures."); *Foley*, 272 F.R.D. at 131 (a plaintiffs' low net shares purchased is not relevant "since all of [its] sales occurred *after* partial corrective disclosures"); *Bodri v. GoPro, Inc.*, No. 16-cv-00232-JST, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016) (rejecting net shares purchased and retained shares calculation in favor of LIFO methodology because "gradual disclosures [were] involved"); *In re Gentiva*, 281 F.R.D. at 120 (rejecting argument that court should appoint movant with most net shares and noting that "the second [*Olsten-Lax*] factor (net shares purchased) diminishes in importance upon the realization that, here, partial corrective disclosures were reaching investors on a periodic basis").[8]  For

---

680779, at *3 n.3 (E.D.N.Y. Mar. 2, 2007) (same), or the disclosures occurred at the end of the class period, *see Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 268 (S.D.N.Y. 2015) (excluding in-and-out losses where case alleged only two disclosures during last 11 days of class period).

[8]      *Ruland v. InfoSonics Corp.*, No. 06CV1231 BTMWMC, 2006 WL 3746716, at *6 (S.D. Cal. Oct. 23, 2006), cited by the Grahams, only involved a single corrective disclosure. Likewise, in *Schueneman v. Arena Pharm., Inc.*, No. 10CV1959 BTM BLM, 2011 WL 3475380, at *4 (S.D. Cal. Aug. 8, 2011), the two plaintiffs under consideration did not sell any shares after the first of two partial disclosures; thus, the shares retained at the end of the class period more accurately reflected their financial interests in the action.

example, even if a plaintiff sold all of its shares after a partial corrective disclosure and thus possessed 0 shares at the end of the class period, that plaintiff could still have suffered significant losses attributable to the defendants' fraud.  *See Weiss v. Friedman, Billings, Ramsey Grp., Inc.*, No. 05-CV-04617(RJH), 2006 WL 197036, at *4 (S.D.N.Y. Jan. 25, 2006) ("[D]espite the fact that all the Operating Engineers Trust's shares were sold before the class period ended, one would not necessarily have to conclude that the Trust's losses are unattributable to the alleged fraudulent inflation[.]").

The complaints in the Actions allege five separate partial corrective disclosures on September 22, 2017; August 2, 2018; October 17, 2018; October 19, 2018; and November 13, 2018.  *See* ECF No. 1 at ¶¶45-49; *Hubner v. Revolution Lighting Technologies, Inc., et al.*, No. 1:19-cv-02308-JPO (S.D.N.Y.), Class Action Complaint For Violations Of The Federal Securities Laws, ECF No. 1 at ¶¶45-46; *Bishop* Compl. ¶¶44-49, 48-49, 53-58.  Therefore the fraud premium was not constant during the Class Period, and the number of shares retained at the end of the Class Period is irrelevant to the analysis of which plaintiff has the largest financial interest in the litigation.

In any event, the weight of authority overwhelmingly supports applying the fourth *Olsten-Lax* Factor, the approximate losses suffered, to determine a plaintiff's financial interest.[9] *Jinkosolar*, 2012 WL 9476875, at *5 ("It is well settled that '[f]inancial loss, the last factor, is the most important element of the test.'"); *In re Millennial Media, Inc. Sec. Litig.*, 87 F. Supp. 3d 563, 569 ("Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant."); *In re Braskem S.A. Sec. Litig.*, No. 15 Civ. 5132 (PAE), 2015

---

[9]  *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 119 (S.D.N.Y. 2010) does not support the Grahams' argument because the court appointed the lead plaintiff movant with the largest approximate losses, which, in this case is Remer.

9

WL 5244735, at *4 (S.D.N.Y. Sept. 8, 2015) (collecting cases, and noting that "courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant").

## CONCLUSION

Because Remer has the largest financial interest in the Actions, and no plaintiff has presented any "proof" that he does not satisfy Rule 23's typicality and adequacy requirements, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II), Remer's motion should be granted in its entirety.

Dated:  April 22, 2019                    Respectfully submitted,

                                          **FARUQI & FARUQI, LLP**

                                          By:_____ */s/ Richard W. Gonnello*
                                                  Richard W. Gonnello

                                          Richard W. Gonnello
                                          Megan Sullivan
                                          Sherief Morsy
                                          685 Third Avenue, 26th Floor
                                          New York, NY 10017
                                          Ph: (212) 983-9330
                                          Fx: (212) 983-9331
                                          E-mail: rgonnello@faruqilaw.com
                                                  msullivan@faruqilaw.com
                                                  smorsy@faruqilaw.com

                                          *Attorneys for [Proposed] Lead Fred Remer and*
                                          *[Proposed] Lead Counsel for the putative Class*

10