# Exhibit A

 Positive

As of: October 20, 2015 1:40 PM EDT

# *In re Watchguard Secs. Litig.*

United States District Court for the Western District of Washington

July 13, 2005, Decided ; July 13, 2005, Filed

Master File No. C05-678JLR

**Reporter**

2005 U.S. Dist. LEXIS 40923

IN RE WATCHGUARD SECURITIES LITIGATION, This Document Relates to: All Actions

**Subsequent History:** Motion granted by *In re Watchguard Secs. Litig., 2006 U.S. Dist. LEXIS 27217 (W.D. Wash., Apr. 21, 2006)*

## Core Terms

class period, premium, lead plaintiff, shares, contestants, approximate, financial stake, factors, largest, losses, stock, fluctuations, presumptive, constant, number of shares, courts, class member, securities, typicality, adequacy, damages, class action, fraud-induced, requirements, purchases, parties, days, cap

**Counsel:** [*1] For Alan Pius, On Behalf of Himself and All Others Similarly Situated, Mark Wald, On behalf of himself and all others similarly situated, Plaintiffs: Tamara J Driscoll, LERACH COUGHLIN STOIA, GELLER RUDMAN & ROBBINS (WA), SEATTLE, WA.

For Evelyn Perkins, Individually and on behalf of all others similarly situated, Plaintiff: Elizabeth Ann Leland, Juli Farris Desper, Lynn Lincoln Sarko, KELLER ROHRBACK, SEATTLE, WA.

For Dearborn Heights Act 345 Police & Fire Retirement System, Plaintiff: Aelish M Baig, Azra Mehdi, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS (SF), SAN FRANCISCO, CA; Tamara J Driscoll, LERACH COUGHLIN STOIA, GELLER RUDMAN & ROBBINS (WA), SEATTLE, WA.

For Steven Neff, on behalf of himself and all others similarly situated, Plaintiff: Jay H Zulauf, W Scott Zanzig, HALL ZANZIG ZULAUF CLAFLIN MCEACHERN, SEATTLE, WA;

For Steve Klein, On behalf of himself and all others similarly situated, Petitioner: Dan Drachler, ZWERLING SCHACHTER & ZWERLING, SEATTLE, WA.

For Watchguard Technologies Inc, Steven N Moore, Edward J Borey, James A Richman, Defendants: James N Kramer, Justin M Lichterman, Michael D Torpey, Stephen M Knaster, ORRICK HERRINGTON & SUTCLIFFE [*2] (SF), SAN FRANCISCO, CA; Louis David Peterson, HILLIS CLARK MARTIN & PETERSON, SEATTLE, WA.

For Michael E. McConnell, Defendant: Justin M Lichterman, ORRICK HERRINGTON & SUTCLIFFE (SF), SAN FRANCISCO, CA.

**Judges:** JAMES L. ROBART, United States District Judge.

**Opinion by:** JAMES L. ROBART

Sherief Morsy

2005 U.S. Dist. LEXIS 40923, *3

## Opinion

CLASS ACTION

### I. INTRODUCTION

This matter comes before the court on three competing motions for appointment of a lead plaintiff in this securities class action. No party has properly requested oral argument. [1] For the reasons stated below, the court DENIES the motion of West German Investments, Ltd. and the Henderson Group (collectively "WGI-Henderson") (Dkt. # 7), DENIES the motion of Glacken Investments, LLC ("Glacken") (Dkt. # 8), and GRANTS the motion of Dearborn Heights Act 345 Police & Fire Retirement System ("Dearborn Heights") (Dkt. # 6). The court names Dearborn Heights as the presumptive lead plaintiff in this action.

### [*3] II. BACKGROUND

This putative class action concerns alleged securities fraud by WatchGuard Technologies, Inc. ("WatchGuard") and several of its officers and directors. The putative class period began on February 12, 2004 when the Defendants allegedly began misrepresenting WatchGuard's revenues, and ended on March 15, 2005 with WatchGuard's disclosure that it would restate prior quarterly revenue reports. Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), counsel for Dearborn Heights, the first party to file a complaint in this action, posted a notice in a national business publication regarding the commencement of this class action and the deadline for interested class members to file motions to serve as the lead plaintiff. *15 U.S.C. § 78u-4(a)(3)*.

Three contestants, Dearborn Heights, WGI-Henderson, and Glacken, are vying for the lead plaintiff position. The court now turns to the rules that govern this competition. As the leading Ninth Circuit authority observes, "this is not a beauty contest." *In re Cavanaugh, 306 F.3d 726, 732 (9th Cir. 2002)*. It is a contest over money, and which contestant stands to gain more of **[*4]**  it.

### III. DISCUSSION

#### A. Round One: Which Contestant Has the Most to Gain?

#### 1. The PSLRA's Lead Plaintiff Selection Procedure

Among the substantial changes in securities class action litigation that the PSLRA imposed was a new procedure for appointing a lead plaintiff. The first class member to file a complaint must provide notice to all class members that they must petition the court to serve as lead plaintiff. *15 U.S.C. § 78u-4(a)(3)(A)*. Once contestants have timely identified themselves, the court must consider their petitions within 90 days of the first class member's notice or "as soon as practicable" after a decision consolidating multiple actions. *15 U.S.C. § 78u-4(a)(3)(B)(i)-(ii)*. The court must presumptively award lead plaintiff status to the moving class member who satisfies the class representative requirements of Fed. R. Civ. P. 23 and has the "largest financial interest in the relief sought by the class. . . ." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*. A class member who meets these requirements is presumptively the lead plaintiff, subject **[*5]**  to rebuttal from other class members that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb)*.

Whether the contestants here meet Fed. R. Civ. P. 23 requirements needs little discussion. In addressing this threshold issue, the court must rely solely on the pleadings and declarations that each contestant provides.

---

[1]  No party requested argument in compliance with Local Rules W.D. Wash. CR7(b)(4). It appears that counsel for WGI-Henderson and Glacken attempted to request oral argument through the court's electronic filing system. The court notes that counsel's method of requesting oral argument is insufficient under the Local Rules. In any event, the court finds the instant motions appropriate for disposition without oral argument.

Sherief Morsy

*Cavanaugh, 306 F.3d at 730*. Each contestant has provided declarations sufficient to show that it meets the twin requirements for class representatives under Fed. R. Civ. P. 23: claims typical of the claims and defenses of other class members and an ability to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(3)-(4); *Cavanaugh, 306 F.3d at 731*.

**2. Factors to Use in Deciding Who Has the Largest Financial Stake**

The court next turns to the contestants' financial stake **[\*6]** in this litigation. Dearborn Heights purchased 24,700 shares of WatchGuard stock during the class period and retains all of the stock. WGI-Henderson purchased 39,600 shares of WatchGuard stock during the class period, sold 2,500 shares within the class period, sold 9,000 shares within 90 days of the close of the class period, and retains 28,100 shares. [2] Glacken purchased 12,000 shares of WatchGuard stock during the class period, sold 7,500 shares during the class period, and retains 4,500 shares. Each party made multiple WatchGuard stock purchases during the class period; each party paid a variety of prices for those purchases.

 **[\*7]**  No settled law informs the court on how best to translate these figures into a determination of who has the largest financial stake in this action. Although the Ninth Circuit clarified many aspects of the PSLRA's lead plaintiff selection procedure in Cavanaugh, it expressly declined to instruct district courts on how to calculate the largest financial stake. *306 F.3d at 730 n.4*. WGI-Henderson points to a Third Circuit decision in which the court "agree[d] with the many district courts that have held that courts should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." *In re Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001)* (cited repeatedly in Cavanaugh). Within our circuit, district courts have considered those factors, although at least one court has focused on the *net* number of shares purchased during the class period. *Ferrari v. Gisch, 225 F.R.D. 599, 604 (C.D. Cal. 2004)*. This factor, plus the three from *Cendant* **[\*8]**  , are nearly ubiquitous guides for analyzing the largest financial stake among lead plaintiff contestants. E.g., *In re Cardinal Health, Inc. Sec. Litig., 226 F.R.D. 298, 303 (S.D. Ohio 2005)* ("The four-factor inquiry has been widely accepted in the case law and various treatises. . . .").

Keeping in mind the Ninth Circuit's mandate that the plaintiff with the largest financial stake under the PSLRA is the plaintiff with "the most to gain" from the lawsuit (*Cavanaugh, 306 F.3d at 730*), the court examines these four factors. Critical to this discussion is the notion of a "fraud premium." The core allegation of any securities fraud litigation is that investors paid an inflated price for shares during the class period because of the alleged fraud. The amount by which the share price increases as a result of the fraud is the fraud premium. *In re Critical Path, Inc. Sec. Litig., 156 F. Supp. 2d 1102, 1107-08 (N.D. Cal. 2001)*. Hypothetically, the fraud premium may remain constant throughout the class period. It also may fluctuate during the class period. Potential causes of fluctuations in the fraud premium include "partial disclosures" that **[\*9]**  ameliorate the effect of the fraud during the class period, as well as "market forces" that "interact[] with the fraudulently misstated information" to "caus[e] the fraud premium to vary over time." *In re McKesson HBOC, Inc. Sec. Litig., 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999)* (summarizing plaintiff's contentions). The court can envision other factors that may cause the premium to vary over the class period, including additional disclosures from the defendants that increase or decrease the effect of the original fraudulent misstatements, or cases involving multiple misstatements at different times during the class period.

The discussion of potential fluctuations (or potential constancy) in the fraud premium is not merely academic; it has substantial consequences in this case. If the fraud premium is assumed to be constant, then the net number of shares purchased during the class period is a *perfect* indicator of who has the most to gain in the litigation. Under

---

[2]   The WGI-Henderson group is an amalgamation of West German Investments, an institutional investor, and a collection of four different stockholder groups under the umbrella of Bill Henderson. In order to reconcile the figures that WGI-Henderson presented, the court assumed (as apparently did all parties) that the indication that Addison Marble & Tile Corp. (a stockholder under the Henderson umbrella) purchased 3,000 shares of WatchGuard stock on March 14, 2005 is a typographical error, and that those shares were actually purchased on March 14, *2003*, outside the class period.

Sherief Morsy

Case 1:19-cv-00980-JPO    Document 37-1    Filed 04/22/19    Page 5 of 7

Page 4 of 6
2005 U.S. Dist. LEXIS 40923, *9

this assumption, every net share [3] purchased during the class period gives rise to an identical fraud-induced loss equal to the fraud premium. Whoever purchased the most net shares suffered the most **[*10]** fraud-induced loss, and therefore has the most to gain in the litigation. Focusing on this factor, WGI-Henderson had net purchases of 37,100 [4] shares during the class period, more than either Dearborn Heights (24,700 net shares) or Glacken (4,500 net shares).

If the fraud premium is not constant throughout the class period, then most of the four factors shed little light on which plaintiff has the largest financial stake. A fluctuating fraud premium makes it **[*11]** impossible to ascertain how much fraud-induced loss an investor suffers from a given purchase, at least not without conducting a substantial inquiry into how the fraud premium varied over the class period. Where the fraud premium fluctuates, neither the gross nor the net number of shares purchased is a good indicator of financial loss, since the loss depends on how large the fraud premium was at the time of the purchase. As to the "net funds expended" factor, it serves as a rough upper limit for a party's financial stake, because one cannot lose more than one has invested. This factor provides little more than a rough upper limit, however, because constant fraud premium or not, the net funds expended does not account for market fluctuations unrelated to the alleged fraud that may inflate a plaintiff's total expenditures.

This brings the court to the last of the four factors -- the plaintiff's approximate losses. Alone among the four, this factor yields an estimated financial stake that is independent of the fraud premium, constant or not. Under the PSLRA, a plaintiff's damages are capped at the difference between the price the investor paid and the price of the stock after the fraud **[*12]** has been purged. For shares sold within 90 days of the end of the class period, the PSLRA caps damages at the difference between the price paid and the average of the stock's daily closing price for each market day following the end of the class period. *15 U.S.C. § 78u-4(e)*. For shares retained or sold after the 90-day post-class period, damages are capped at the difference between the price paid and the average of the stock's daily closing price for each market day in the 90-day period. Id. A plaintiff can approximate his loss by calculating the maximum damages he or she could be awarded under the PSLRA damage cap.

The contestants here have used essentially this method to estimate their losses. WGI-Henderson relies on the average share price 76-day post-class period that ended just before it filed its motion, rather than the full 90-day period the PSLRA mandates. Glacken and Dearborn Heights used a slightly larger price ($ 3.33 v. $ 3.28) using the period ending June 6, 2005. Using this method, Dearborn Heights has the largest approximate loss. It had approximate losses of $ 89,000. WGI-Henderson claims approximate losses of $ 45,000; [5] Glacken claims **[*13]** $ 46,000.

### 3. The Court Concludes that Approximate Loss is the Most Illuminating Factor in Determining Who Has the Most to Gain from the Litigation.

In this case, the court's choice of presumptive lead plaintiff will require it to decide upon which of the four financial stake factors it will rely most heavily. If the court relies on the net number of shares purchased, WGI-Henderson is the presumptive lead plaintiff. If it relies on approximate losses, Dearborn Heights will prevail. As previously noted, both the gross number of shares purchased and the net expenditures during the class period are less illuminating factors.

Several courts in this circuit have focused on the net number of shares purchased as the most illuminating factor, relying on an assumption of a **[*14]** constant fraud premium. E.g., *Critical Path, 156 F. Supp. 2d at 1107-08*; *In re*

---

[3]   If the fraud premium is constant, the gross number of shares purchased during the class period is not an appropriate factor to consider. Any share purchased and sold during the class period would result in no fraud-induced loss, because the party would pay the fraud premium on purchase but reclaim it on sale.

[4]   WGI-Henderson claims net share purchases of 39,600 shares, but there is no indication that it accounted for the 2,500 shares it admittedly sold during the class period. The court thus calculates the group's net purchases at 37,100 shares.

[5]   Again, the court has adjusted WGI-Henderson's numbers to account for the WatchGuard shares it sold during the class period. Even if it had not, WGI-Henderson's claimed approximate losses of $ 65,843 are less than Dearborn Heights' losses.

Sherief Morsy

2005 U.S. Dist. LEXIS 40923, *14

*Network Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999)*. The constant premium assumption is almost certainly incorrect, as many of these courts recognize, but it is not possible in a class action's early stages to determine how the potential fraud premium fluctuated over the class period. *Network Assocs., 76 F. Supp. 2d at 1027* ("At this stage . . . it is impossible to determine such variations [in the fraud premium]. The best that can be done is to assume a constant fraud premium per share throughout the class period.").

The court agrees with these courts to the extent they find that it is impractical to attempt to determine fluctuations in the fraud premium before selecting a lead plaintiff. A host of market influences can operate to inflate or deflate the fraud premium during the class period. The ups and downs in the fraud premium may be difficult to ascertain even after discovery, much less at the outset of the litigation. The PSLRA contemplates a quick selection of a lead plaintiff near the outset of a case, without opportunity [*15] for discovery on likely damages or losses. *15 U.S.C. § 78u-4(a)(3)(B)(i)-(ii)*; *In re McKesson HBOC, Inc. Sec. Litig., 97 F. Supp. 2d 993, 996 (N.D. Cal. 1999)* ("There is therefore a need for both speed and reasonable accuracy."). Under those conditions, early speculation about fraud premium fluctuations is inappropriate. [6]

[*16] The most illuminating of the four factors, therefore, is the plaintiff's approximate loss, the only factor that makes no assumptions regarding the fraud premium. Calculating approximate loss under the PSLRA damage cap provides the only objective measure of economic loss that does not depend on the fraud premium. Other courts use this approach. E.g., *In re Bally Total Fitness Secs. Litig., No. 04 C 3530, 2005 U.S. Dist. LEXIS 6243, at *13-15 (N.D. Ill. March 15, 2005)*; *In re Vicuron Pharms., Inc. Sec. Litig., 225 F.R.D. 508, 510-11 (E.D. Pa. 2004)*. The approach is far from perfect, as in many cases a party's actual fraud-induced loss will be substantially less than this amount, but it is the most objective indicator as applied to this case.

Turning to the putative lead plaintiffs in this action, the court's choice of lead plaintiff is now clear. As Dearborn Heights is the plaintiff with the largest approximate losses, it has the most to gain from this litigation. The court selects Dearborn Heights as the presumptive lead Plaintiff.

### B. Round Two: Can the Presumptive Lead Plaintiff Lead?

In order to progress from presumptive lead Plaintiff [*17] to actual lead Plaintiff, the court must provide the unselected contestants with an opportunity to rebut Dearborn Heights' showing of adequacy and typicality under Fed. R. Civ. P. 23. *15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)*; *Cavanaugh, 306 F.3d at 730* ("At [this] stage, the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy."). The court notes that the parties have devoted their briefing on the instant motions to establishing their own adequacy and typicality as class representatives and arguing over who has the greatest financial stake. The parties have not addressed Dearborn Heights' adequacy and typicality from an adversarial posture.

The court therefore orders that within 14 days of this order, Plaintiffs other than Dearborn Heights may file briefs attempting to rebut the presumption that Dearborn Heights will serve as the lead Plaintiff in this action. Dearborn Heights may respond within 21 days of this order. No reply briefs are necessary. The court directs any party wishing to file a brief to consider [*18] carefully the discussion of typicality and adequacy in Cavanaugh. The inquiry is not relative. *Cavanaugh, 306 F.3d at 732*. The court is not concerned with which putative class representative would be most adequate or most typical, but only with whether Dearborn Heights meets Ninth Circuit standards. Id. ("So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if . . . some other plaintiff would do a better job.").

### IV. CONCLUSION

[6] WGI-Henderson's citation to the discussion of securities class action damages in Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), is inapposite. The Dura court held that a plaintiff needed to do more than allege the purchase of stock at a fraud-inflated price in order to plead loss causation. Id. at 1634. The Supreme Court recognized, as does this court, that numerous factors may affect the price of a security. Id. at 1631-1631. The Supreme Court did not suggest that a court should guess about the effect of these as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue.

Sherief Morsy

2005 U.S. Dist. LEXIS 40923, *18

For the reasons stated above, the court GRANTS Dearborn Heights' motion to serve as lead plaintiff (Dkt. # 6), DENIES WGI-Henderson's motion (Dkt. # 7), and DENIES Glacken's motion (Dkt. # 8).

DATED this 13th day of July, 2005.

JAMES L. ROBART

United States District Judge